**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

|  |  |
|---|---|
| MARIA ELENA OCHOA; SHAINA RICKS, MARY RICKS; and FAIR HOUSING COUNCIL OF SOUTH TEXAS, <br><br> Plaintiffs, <br> v. <br><br> D.R. HORTON, INC.; and CONTINENTAL HOMES OF TEXAS, L.P. <br><br> Defendant. | Case No. 5:23-cv-1416 |

## COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

### NATURE OF THE ACTION

1.      Plaintiffs Maria Elena Ochoa, Shaina Ricks, Mary Ricks, and the San Antonio Fair Housing Council, Inc. d/b/a Fair Housing Council of South Texas (collectively, "Plaintiffs"), bring this action against Defendants D.R. Horton, Inc., and Continental Homes of Texas, L.P., (collectively, "Defendants" or "D.R. Horton"). Plaintiffs seek a declaratory judgment, permanent injunctive relief, and damages resulting from discrimination because of disability in the provision of housing. This action arises under the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601, *et seq.*, and the Texas Fair Housing Act, Tex. Prop. Code § 301.001, *et seq.*

2.      D.R. Horton claims to be the largest new homes builder in the United States, with construction operations in 33 states, including Texas. In fiscal year 2022, D.R. Horton delivered over 76,000 new homes, collected $31.9 billion in revenue, and had net income of nearly $5.4

billion. In the South Central United States alone, D.R. Horton closed on over 24,000 homes and collected nearly $8.2 billion in revenues.

3.      D.R. Horton maintains policies and practices that discriminate against homebuyers with disabilities. In chief, D.R. Horton has a strict policy of not allowing any changes to building plans during the pre-construction and construction process, including where such changes are necessary for a prospective homebuyer, or a homebuyer's family member, with a disability to use and enjoy the home. D.R. Horton refuses to consider—let alone grant—any exceptions to its policy, even if the homebuyer is willing to pay for the costs of any modifications. This policy makes housing inaccessible and/or prohibitively costly for people with disabilities. If a homebuyer with a disability requires a wider doorway or hallways to accommodate a wheelchair or needs a roll-in shower in lieu of a bathtub, it would be substantially more costly—if not impossible—to retrofit a home once complete instead of easily incorporating the changes while the home is being initially constructed. For example, price estimates to widen a single, already-built doorway run up to $2,500, while the cost to build a doorway slightly wider in the first place is negligible.

4.      Federal and state anti-discrimination laws prohibit the denial of requests for reasonable accommodations from rules, policies, or practices when necessary to give a person with a disability equal opportunity to use and enjoy a dwelling. In this context, requests for an exception to D.R. Horton's policy of prohibiting changes to building plans are requests for reasonable accommodations. Anti-discrimination laws also prohibit the denial of requests for reasonable modifications that may be necessary to afford a person with a disability full enjoyment of their home, provided that the person pay for related expenses. Joint guidance from the U.S. Department of Justice and the U.S. Department of Housing and Urban Development—

which is regularly relied upon by developers, homebuyers, regulators, and courts—confirms that reasonable modifications include "structural changes to a dwelling unit that has not yet been constructed," including changes such as site grading or installing accessible bathroom features made while a home is under construction. In this context, requests for alterations to building plans—including for wider hallways, changes to grading, and accessible bathrooms—are requests for reasonable modifications. Reasonable accommodation and reasonable modification requests must be assessed on a case-by-case basis and housing providers may not establish blanket policies categorically denying certain types of requests.

5.      D.R. Horton's policy severely harms people with disabilities. For example, in 2022, Plaintiff Ochoa approached D.R. Horton about purchasing a new home for herself and her disabled father because its properties were close to the hospital where her father was receiving treatment. Ochoa requested that changes be made to D.R. Horton's preset floor plan—including the removal of a bathtub, installation of a ramp, and widening of doorways—to accommodate her father's wheelchair and walker. After making this request to a D.R. Horton representative, Ochoa was told that those modifications were not allowed while construction was ongoing, even though Ochoa offered to cover the cost if the modifications were made during initial construction. As a result, Ochoa had to wait to make modifications until after the home had been completed, significantly delaying her move in and requiring her to spend over $12,000 to make the home accessible—multiple times what it would have cost to make those modifications while the home was under construction. Even then, her home remained inaccessible to her father, largely confining him to his room during the final stages of his life. Plaintiffs Shaina and Mary Ricks faced a nearly identical experience: their requests to make modifications to a preset floor plan prior to the completion of construction to accommodate Mary's disabilities were flatly

denied by D.R. Horton, and because they could not afford post-construction modifications Mary still has difficulty getting around her home and using the inaccessible bathroom.

6.     After receiving complaints from Plaintiff Mary Ricks, Plaintiff Fair Housing Council of South Texas ("FHCST") conducted an investigation to determine the nature and extent of D.R. Horton's discriminatory treatment. This investigation revealed that D.R. Horton's discriminatory treatment of Plaintiffs Ochoa and Shaina and Mary Ricks was the result of a formal policy against permitting any changes to its preset floor plans, even reasonable modifications to make the homes accessible.

7.     D.R. Horton's unlawful policies and practices have frustrated and impaired Plaintiff's mission to promote fair housing and eliminate discriminatory housing practices across South Texas. FHCST has been forced to divert significant resources to identify and counteract D.R. Horton's conduct, which limits the potentially accessible homes to which FHCST can refer homeseeking clients with mobility impairments. FHCST launched an education and outreach campaign aimed at residents of D.R. Horton's new subdivisions, to sales agents located at D.R. Horton's many sales offices located in FHCST's service area, and to housing consumers. In addition, FHCST has educated residents regarding D.R. Horton's policies and conducted a fulsome investigation of D.R. Horton's subdivisions, including testing and resident surveys. D.R. Horton's conduct has perceptibly impaired FHCST's mission because the resources expended in relation to Defendant's conduct have forced the organization to curtail or cancel other planned activities essential to its mission—including researching potential discrimination in apartment rentals, in-person education and outreach activities, and tester recruitment events—in an effort to mitigate the real-world impact of D.R. Horton's unlawful conduct.

8.      Plaintiffs seek injunctive relief, declaratory relief, and damages for D.R. Horton's continuing violation of the federal Fair Housing Act, 42 U.S.C. § 3604, and the Texas Fair Housing Act, Tex. Prop. Code § 301.025.  D.R. Horton has made clear that it will maintain its discriminatory policies and practices, meaning that, absent judicial redress, the consequent injury to Plaintiffs will continue.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because it arises under the laws of the United States. This Court has supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. § 1367. Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202.

10.      Venue is proper in this District under 28 U.S.C. § 1391(b) because most events and omissions giving rise to Plaintiffs' claims occurred in this District and the individual Plaintiffs' residences and the organizational Plaintiff's principal place of business are in this District and D.R. Horton engages in significant business in the District.

## PARTIES

11.      Plaintiff Maria Elena Ochoa is a resident of Bexar County in D.R. Horton's Solana Ridge community in San Antonio, Texas. Ms. Ochoa sought a pre-construction plans modification for the home she intended to purchase from D.R. Horton in order to accommodate her father's disability.  At the time of the request for accommodation and modifications, Ms. Ochoa's father, now deceased, was a person with a disability that substantially limited major life activities, including walking. Specifically, Ms. Ochoa's father required use of a walker and a wheelchair to get around and to enter and exit his home.

12.     Plaintiff Shaina Ricks is a resident of Bexar County in D.R. Horton's Redbird Ranch community in San Antonio, Texas. Ms. Ricks sought a pre-construction plans modification to the home she planned to purchase from D.R. Horton in order to accommodate the disability of her mother, Plaintiff Mary Ricks.

13.     Plaintiff Mary Ricks is a resident of Bexar County in D.R. Horton's Redbird Ranch community in San Antonio, Texas. Ms. Ricks sought a pre-construction plans modification to accommodate her disability to the home her daughter planned to purchase from D.R. Horton and have them build. Ms. Ricks is, and was at the time of seeking the modifications of her planned home, a person with a disability who suffers from arthritis that substantially limits major life activities, including walking.

14.     Plaintiff Fair Housing Council of South Texas is a 501(c)(3) nonprofit organization incorporated in Texas, with its principal place of business at 4414 Centerview Drive, Suite 229, San Antonio, Texas 78228. It is dedicated to promoting fair housing and eliminating discriminatory housing practices in the areas of rental housing, real estate sales, mortgage lending, and homeowners' insurance across South Texas. FHCST works to eliminate housing discrimination and to ensure equal opportunity for all people through advocacy, education and outreach, counseling, and investigation.

15.     Defendant D.R. Horton, Inc. is a corporation incorporated in Delaware with its headquarters in Arlington, Texas. In addition to maintaining its headquarters there, D.R. Horton conducts extensive operations in the State of Texas. In the San Antonio region alone, D.R. Horton currently has hundreds of homes on the market across 33 subdivisions as of November 2023. According to its public filings, D.R. Horton also operates under the name "Express Homes."

16.     Defendant Continental Homes of Texas, L.P., ("Continental") is a domestic limited partnership with its headquarters in Fort Worth, Texas. According to its filings with the Texas Secretary of State's Office, Continental also does business as "D.R. Horton Homes" and as "Express Homes."

17.     In acting or failing to act as alleged herein, Defendants were acting through their employees, officers, and/or agents and are liable on the basis of the acts and omissions of their employees, officers, and/or agents.

18.     In acting or failing to act as alleged herein, each employee, officer, or agent of Defendants was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by Defendants as principal.

## FACTUAL BACKGROUND

### A.  The Need for Accessible Housing in South Texas

19.     There are hundreds of thousands of people in South Texas who, like Mary Ricks and Plaintiff Ochoa's father, have ambulatory and other disabilities. These individuals face enormous barriers in the housing market due to the lack of accessible housing in the region, barriers that are compounded when they are subjected to discriminatory treatment.

20.     An individual with a physical disability may require various modifications to a residence to afford them full enjoyment of their home. To get into the home, a person with a disability may require changes to grading so that they can enter from the street or through the garage. To move around the home, a person with a disability may require widened doorframes through which their wheelchair or walker can pass. To use the bathroom, a person with a disability may require installation of grab bars and a roll-in shower. These alterations enable

people with disabilities to perform basic functions of daily life; without them, their use and enjoyment of their homes will be severely diminished, if not entirely compromised.

21.     The vast majority of existing housing in America is inaccessible to people with disabilities. According to one study, just 0.15 percent of housing units in the United States are fully wheelchair accessible and under 4 percent of housing units could be considered livable by people with moderate mobility difficulties, meaning the units have accessible bathrooms with grab bars and people who have difficulty walking independently can navigate them. And only a third of units are potentially modifiable (having some structural features necessary for accessibility but in need of additional modifications), locking out people with mobility-related disabilities from most of the existing housing market.

22.     Newly constructed homes offer an important, potentially accessible alternative for people with disabilities, particularly because these homes may be modified during planning and construction to meet the prospective occupant's accessibility needs. Most newly constructed homes are not custom built: per 2021 estimates, just 17.6% of new single-family homes were custom built. As a result, homebuyers with disabilities must rely on modifications to existing building plans in order to accommodate their disability-related needs. By refusing to allow such modifications during the pre-construction and construction phases, D.R. Horton's discriminatory policies and practices have the effect of constricting the already limited pool of accessible housing for people with disabilities in South Texas.

**B.  Legal Requirement to Grant Requests for Reasonable Modifications and Reasonable Accommodations**

23.     The federal Fair Housing Amendments Act (FHAA) and its Texas state law analog prohibit discrimination in the sale or rental of housing because of disability. The text of the FHAA states that discrimination includes a refusal to make reasonable accommodations in

rules, policies, practices, or services, when such accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B); Tex. Prop. Code Ann. § 301.025(c)(2). Where there is a disability-related need, a requested accommodation must be granted so long as it does not impose an undue financial and administrative burden or fundamentally alter the nature of the provider's operations. This determination of reasonableness must be made on a case-by-case basis based on various factors, such as the cost of the requested accommodation, the financial resources of the provider, the benefits that the accommodation would provide to the requester, and the availability of alternative accommodations.

24.     In the context of this litigation, a request for an exception from D.R. Horton's policy prohibiting changes to building plans prior to and during construction in order to allow for an accessibility-related change is one for a reasonable accommodation.

25.     The text of the FHAA also states that discrimination includes a refusal to permit, at the expense of the resident, reasonable modifications that are necessary to afford a person with disabilities the full enjoyment of the home. 42 U.S.C. § 3604(f)(3)(A); Tex. Prop. Code Ann. § 301.025(c)(1).

26.     Requests for reasonable modifications may be made before, during, or after home construction. Joint guidance from the U.S. Department of Justice and the U.S. Department of Housing and Urban Development states that "[a] person may make a request for a reasonable modification at any time. An individual may request a reasonable modification of the dwelling at the time that the potential tenancy or purchase is discussed." The guidance elaborates that

accessibility-related "structural changes to a dwelling unit that has not yet been constructed" are to be considered reasonable modifications.[1]

27.     The joint guidance lists examples of reasonable modification requests, which closely match the requests that are the subject of this litigation: (1) a buyer with a mobility disability purchasing a single family dwelling under construction who asks for a bathroom sink with a floorless base cabinet with retractable doors that allows the buyer to position his wheelchair under the sink; (2) a buyer with a mobility disability purchasing a ground floor unit in a detached townhouse who requests that the builder grade the entrance to eliminate the need for the step at the front door; and (3) a buyer with a mobility disability who wishes to have grab bars installed to make the bathroom accessible.

28.     The joint guidance further clarifies that if a purchaser with a disability needs different or additional features added to a unit under construction or about to be constructed, the purchaser is only responsible for any additional cost that the structural changes might create over and above what the original design would have cost.

## C.  D.R. Horton Denies Plaintiff Ochoa's Reasonable Modification Requests

29.     In 2022, Plaintiff Ochoa was in the market for an accessible home in the San Antonio area. Plaintiff Ochoa's father had a disability that required him to use a walker and a wheelchair, and she thus sought an accessible home close to the hospital where he was receiving treatment.

30.     Plaintiff Ochoa took a tour of a D.R. Horton model home at Solana Ridge by D.R. Horton, a subdivision of new single-family homes located in San Antonio, constructed by D.R.

---

[1] Joint Statement of the Department of Housing and Urban Development and the Department of Justice, Reasonable Modifications Under the Fair Housing Act at 15 (Mar. 5, 2008), https://www.hud.gov/sites/documents/reasonable_modifications_mar08.pdf

Horton, and branded as a development by D.R. Horton and Express Homes. Plaintiff Ochoa spoke with a D.R. Horton sales counselor about purchasing a home at Solana Ridge, and the sales counselor informed her that the homes on offer would be built according to a preset floorplan. To accommodate her father's disability, Plaintiff Ochoa asked the D.R. Horton sales counselor about making modifications to the floor plan, including the removal of the bathtub from the bathroom, which would allow for the installation of an accessible, walk-in shower. In response, the sales counselor told her that she could not make those changes while the home was under construction. Plaintiff Ochoa asked to speak to someone else, and the sales counselor referred her to another D.R. Horton representative, who confirmed that modifications could only be made after she closed on the home, and Plaintiff Ochoa was told that, per D.R. Horton policy, closing could not take place until construction on the home was completed.

31.     Plaintiff Ochoa made renewed requests to the D.R. Horton sales counselor to modify the preset floor plan during the construction process, including requests to widen doorways to allow her father's walker and wheelchair to fit through and to install a ramp. Plaintiff Ochoa offered to cover the cost of making those modifications. The sales counselor told her she could only make changes after she moved in. On one occasion, the sales counselor measured the walker and acknowledged it would not fit through certain doorways. Nevertheless, the sales counselor told her that he could not make any modifications to the floor plan. The sales counselor also told her that the doorway width was standard in D.R. Horton's floor plans, meaning that no alternative plans would have addressed the problem.

32.     After construction was finished and Plaintiff Ochoa closed on the home, she paid for substantial retrofitting work to make the home accessible. This work included substantial renovation to the bathroom—including removal of the bathtub, replacement of piping, and

demolition of a wall to provide for a large walk-in shower—and the installation of a ramp. In total, Plaintiff Ochoa spent in excess of $12,000 on these modifications. This additional construction also delayed her move into the home by a month, fully depriving her of her home during that time.

33.    Ms. Ochoa could not find someone to change the doorway widths after construction. Such modifications would likely have cost her thousands of dollars. The doorways in her home thus remained too narrow to accommodate her father's walker and wheelchair, preventing him from navigating the home alone and reducing his ability and willingness to move around the home.

34.    In the last stage of his life, Ms. Ochoa's father primarily remained in his room except to eat meals or go to medical appointments. When Plaintiff Ochoa asked him to come to the kitchen or come outside with her, her father replied that it was too much trouble to get from room to room because the narrow width of the doorway prevented him from getting into and out of his bedroom without assistance. The narrow doorways also made use of his wheelchair in the home practically impossible, forcing him to use his walker instead. The inaccessibility of the home thus meaningfully hurt the quality of his life during his final days.

**D.  D.R. Horton Denies Plaintiffs Shaina and Mary Ricks' Reasonable Modification Requests**

35.    In 2021, Mary Ricks and her daughter Shaina Ricks were in the market for a home in the San Antonio area. Mary Ricks suffered (and continues to suffer) from physical disabilities, including arthritis, which limit her mobility. Consequently, the Ricks sought to purchase a home that had accessible features sufficient to afford her full enjoyment of the premises, including a walk-in shower with grab bars and a seat, an accessible faucet, and replacement of the existing toilet with a raised ADA-compliant toilet.

36.     The Ricks approached D.R. Horton about purchasing a home at Redbird Ranch, a subdivision of new single-family homes constructed by D.R. Horton and located in San Antonio. A D.R. Horton ales representative informed the Ricks that the homes on offer would be built according to a preset floorplan. To accommodate Mary Ricks' disability, the Ricks asked the sales representative about making modifications to the floor plan to make the bathroom more accessible. In response, the sales representative informed them that they could not make any modifications to the floor plan. Later, Mary Ricks asked another D.R. Horton sales representative if D.R. Horton would make the modifications if the Ricks agreed to pay the difference in cost. The sales representative told her that no changes could be made before the home had been constructed. The Ricks made renewed requests to the D.R. Horton sales representative to make accessibility-related modifications to the floorplans while the home was under construction. The sales representative told them that D.R. Horton could not make any modifications because everything was set "as is."  Based on this repeated refusal, they did not attempt to make any further modification requests related to the bathroom or other features of the home—such as widening the interior doorways, installing ADA-compliant door handles, and altering the inaccessible path to the front door—because they reasonably believed that such requests would be futile.

37.     As a result, the Ricks have been deprived full enjoyment of their home. Mary Ricks has had difficulty using the bathroom, which remains very challenging to use because of its inaccessible features. She only showers once a week because it is difficult to use the shower without a bench or grab bars, and she requires assistance from her daughter. Using the inaccessible shower has caused her physical strain and exacerbated her physical ailments. Now that the house has been built, the cost to remove the bathtub, faucet, and toilet and replace them

with a walk-in shower and an accessible faucet and toilet is prohibitively expensive. In contrast, the cost to install these features in the first instance would have been substantially cheaper. Mary Ricks also faces great difficulty getting around, entering, and exiting her home because her walker does not fit through the home's narrow interior doorways and the path to the entrance to the home is inaccessible. She did not have an opportunity to request changes to these features because of D.R. Horton's policy prohibiting modifications.

### E.  Complaint Received by FHCST

38.    Over the past decade, FHCST has observed a marked increase in the number of disability discrimination complaints filed with its office and ensuring equal housing opportunities for people with disabilities makes up a substantial share of its current workload. Many of these complaints involve housing providers denying requests by people with disabilities for reasonable accommodations or reasonable modifications.

39.    In 2021, Plaintiff Mary Ricks brought to FHCST's attention an example of discrimination against people with disabilities: homebuilders' refusals to make reasonable modifications, at a requester's expense, to pre-construction plans that would make the homes accessible for residents with disabilities. These refusals impose enormous costs on people with disabilities. While alterations to doorframe widths or to grading could be made with little or no additional cost during construction, the cost of these changes balloons once a home has already been substantially constructed; for example, to widen a doorway, the existing doorway must be removed, modifications to the surrounding wall may be required, and labor costs are increased and duplicated. Since the homebuyer will bear these costs in either instance, builders' refusals to allow the modifications during construction needlessly drive up the cost of acquiring an accessible home. In addition, homebuyers may end up purchasing homes with features they

14

cannot use—such as a bathtub or inaccessible shower—which they must then pay to remove and replace with accessible features. And even if a homebuyer is both willing and able to pay these higher costs, retrofitting may delay their moving into their home while the alterations are made, and some changes, such as widening hallways, may be impracticable.

**F.  FHCST's Investigation Confirms That D.R. Horton Maintains Policies and Practices That Discriminate Against People with Disabilities**

40.     In 2022, FHCST began an investigation of D.R. Horton's policies and practices regarding reasonable modification and reasonable accommodation requests made prior to and during home construction in response to Plaintiff Mary Ricks' complaint about D.R. Horton's refusal to permit pre- and during-construction modifications to accommodate disabilities.

41.     As FHCST initiated its investigation, it was aware that D.R. Horton accounts for a large share of the market for new homes in the region and thus has an outsized impact on the availability of accessible homes for people with disabilities in the area FHCST serves. The harmful impact of such a policy on FHCST and area residents with disabilities by a builder with such a large presence in FHCST's service area compelled the organization to conduct a full investigation to identify the nature and scope of D.R. Horton's reasonable accommodation and modification policies.

42.     On March 18, 2022, FHCST conducted a disability sales test at Redbird Ranch, the same subdivision where the Ricks reside in San Antonio, Texas. The tester spoke with one of D.R. Horton's sales representatives and inquired about purchasing a home at Redbird Ranch. The tester asked the sales representative if they could add specific accessibility features to the home during the construction process, at the tester's expense, which were needed because her husband used a wheelchair, including a roll-in shower, grab bars in the master bathroom, accessible routes

from the street, garage door, and back patio into the home, and 32-inch-wide doorframes that would afford her husband full use of the home.

43.     In response, the sales representative informed the tester that D.R. Horton could not make modifications because D.R. Horton homes are built as-is and no changes could be made. When the tester asked if D.R. Horton could make an exception because of her husband's disability and offered to pay for the modifications, the sales representative said no and informed the tester that any changes would have to be made after closing, which could not be until construction was substantially completed.

44.     In so doing, D.R. Horton denied the tester's request for a reasonable accommodation from its policy of disallowing accessibility-related changes to building plans and denied the tester's request for reasonable modifications to be made to the building plan at the tester's expense.

45.     On March 23, 2022, FHCST conducted a disability sales test at Solana Ridge, the same subdivision where Plaintiff Ochoa resides in San Antonio, Texas. The tester spoke with one of D.R. Horton's sales representatives and inquired about purchasing a home at Solana Ridge. The tester asked the sales representative if they could add specific accessibility features to the home during the construction process, at the tester's expense, which were needed because her husband used a wheelchair, including a roll-in shower, grab bars, accessible ramps around the house, and doorframes wide enough for his wheelchair that would afford her husband full use of the home.

46.     In response, the sales representative informed the tester that any changes could only be made after closing on the home, which, per D.R. Horton policy, does not take place until construction has reached a stage where many structural modifications would be impractical.

When the tester offered to pay for the modifications, the representative said that D.R. Horton does not offer modifications.

47.     In so doing, D.R. Horton denied the tester's request for a reasonable accommodation from its policy of disallowing accessibility-related changes to building plans and denied the tester's request for reasonable modifications to be made to the building plan at the tester's expense.

48.     Taken together, these tests reveal not only a troubling pattern of discriminatory conduct, but a formalized, discriminatory policy: in defiance of the explicit requirements of state and federal law, D.R. Horton steadfastly refuses to grant, or even to consider, *any* requests for reasonable modifications to building plans—no matter how reasonable or necessary those modifications may be. This blanket approach is contrary to the legal framework that applies to these requests, which requires individualized consideration.

49.     This investigation also revealed that D.R. Horton has a policy of not allowing buyers to close on their homes until the home has been built to a certain stage. This policy causes an adverse impact on homebuyers with disabilities because they cannot change the grading during the construction process in order to incorporate accessible routes into and around the home or modify the building frame to incorporate necessary accessibility features. Consequently, this policy causes higher retrofitting costs for homebuyers with disabilities needing accessibility-related modifications that could have been made during the construction of the home. D.R. Horton's policy thus has an adverse disparate impact on people with disabilities by disproportionately denying people with disabilities an equal opportunity to obtain accessible housing. These policies and practices are not justified by any legitimate business need or necessity and cause injury to Plaintiffs and others.

50.     Based on its findings through the tests and other investigation, FHCST engaged in an education and outreach campaign to help ensure that prospective and current residents in D.R. Horton's communities were aware of the requirements for reasonable accommodations and modifications in the context of new home construction. FHCST also reached out to D.R. Horton's staff to ensure that they were aware of the relevant fair housing requirements.

51.     FHCST filed a complaint with HUD on February 23, 2023, challenging D.R. Horton's discriminatory conduct. HUD referred the matter to the Texas Workforce Commission, which investigates fair housing complaints under state law. On July 11, 2023, the Texas Workforce Commission discontinued investigation of the complaint.

52.     D.R. Horton has refused FHCST's attempts to resolve its claims without resorting to litigation. In response to a letter describing the results of the tests and why D.R. Horton's policy and practices violate the fair housing laws, D.R. Horton's counsel stated that FHCST was demanding "to have my client fundamentally and completely change its business model from being a production home builder to a custom home builder, which is not economically feasible." These statements verify the existence of D.R. Horton's formalized policy of refusing requests for reasonable modifications to building plans and evince a willful, conscious disregard for the clear requirements of disability discrimination statutes.

## INJURIES TO PLAINTIFFS

### Injuries to Plaintiffs Ochoa and Shaina and Mary Ricks

53.     As a proximate result of the policies and practices described above, Plaintiffs Ochoa and Shaina and Mary Ricks have suffered, continue to suffer, and will suffer in the future, significant loss and injury, including but not limited to, economic losses, emotional distress, pain

and suffering, physical injury and/or substantial risk of physical injury, and deprivation of their housing and civil rights, including full enjoyment of their homes.

54.     Plaintiff Ochoa has suffered thousands of dollars in pecuniary losses because of the modifications she has had to pay for, costs that would have been substantially lower had D.R. Horton agreed to her requested modifications. She has suffered further economic loss from the monthlong delay to move into her home caused by D.R. Horton's illegal conduct. She has suffered emotional distress and risk of physical injury as a result of the overly narrow doorways, which required her to assist her father without his walker in the bathroom and to force the walker through doorways where it did not easily fit.

55.     Plaintiff Mary Ricks has suffered increased physical strain, risk of physical injury, and emotional distress as a result of the difficulties she has faced navigating, entering, and exiting her home. Plaintiff Shaina Ricks has suffered from emotional distress and increased physical strain as a result of having to provide assistance to her mother to use the shower and deal with the inaccessible features of her home.

56.     D.R. Horton has engaged in the discriminatory conduct described herein intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for the rights of current and prospective residents in D.R. Horton's communities and in FHCST's service area, and has caused substantial harm to the residents of the San Antonio region.

### Injuries to Plaintiff Fair Housing Center of South Texas

57.     Plaintiff FHCST has suffered substantial, particularized, and concrete injuries as a direct result of Defendants' unlawful conduct in the San Antonio region.

58.     Defendants' unlawful conduct, policies, and practices have frustrated and obstructed FHCST's mission and ongoing work, forced it to divert its resources to identify and counteract Defendants' conduct, and curtailed its other activities.

59.     FHCST's mission is to ensure that that people in South Texas have equal housing opportunities. FHCST receives fair housing complaints, investigates them, and counsels and advocates for individuals who have been victims of housing discrimination. FHCST conducts educational programs and activities including, but not limited to, trainings, information sessions, and community events. FHCST also works to increase the awareness of policymakers of fair housing issues by meeting with local, state, and federal officials to ensure comprehensive fair housing laws and policies.

60.     As part of its counseling work, FHCST helps people with disabilities within its service area to find accessible housing that meets their needs. Because people with disabilities are likely to have lower incomes than the general population,[2] FHCST generally looks to identify homes that are available at affordable prices and that are—or can be modified to be—accessible. And since the stock of existing housing is largely if not entirely inaccessible for people with disabilities, opportunities for new construction homes that are built or can be modified to be accessible are often the most practical option for homebuyers.

61.     Defendants' discriminatory conduct frustrates FHCST's mission by interfering with its mission-related activities, impairing its ability to achieve its goals of ensuring equal access to housing opportunities, harming the communities that FHCST serves, and making it more difficult for FHCST to serve those communities. Defendants control a substantial share of

---

[2] According to the 2023 Annual Disability Statistics Compendium, the median income for working-age people with disabilities is 19% lower than working-age people with no disability.

the market for affordable, new construction homes in the San Antonio region. At the time of filing, nearly 6.5% of new construction homes priced under $400,000 in San Antonio are sold by Defendants, according to realtor.com. Defendants' policy thus significantly reduces the number of affordable, accessible housing opportunities available to people with disabilities in FHCST's service area by preventing people with disabilities from requesting modifications prior to construction to make homes accessible. As a result, Defendants concretely impair FHCST's housing counseling work by substantially constraining the housing opportunities FHCST is able to identify for people with disabilities.

62.     FHCST has suffered further damages because it was compelled to investigate D.R. Horton's discriminatory practices after the complaint it received from Plaintiff Mary Ricks indicated that D.R. Horton denied requests for reasonable accommodations and modifications in the context of new homes construction. It suffered additional damages when—as a result of the conduct uncovered by its investigation of D.R. Horton —it was forced to divert scarce resources to counter D.R. Horton's discriminatory policy and practices. FHCST has a small staff and had to divert their limited time and incur expenses to conduct the investigation after the complaint it received showed that D.R. Horton likely maintained a policy or practice of unlawfully denying reasonable accommodation and modification requests. The expenditure of resources was necessary to determine the degree and scope of D.R. Horton's noncompliance.

63.     FHCST also diverted staff time and resources to engage in outreach to the potentially affected residents within its service area to educate them regarding their fair housing rights in relation to the types of unlawful discrimination in which D.R. Horton was engaging. These education efforts included sending direct educational mailings to residents in D.R. Horton's communities with information about homebuyers' right to request reasonable

accommodations and modifications, conducting a mail survey of the residents that included information about their right to request reasonable accommodations and modifications and other fair housing protections, and publishing social media advertisements regarding homebuyers' rights to request reasonable modifications in new, pre-construction homes. As a result of these outreach efforts, FHCST identified an additional person, Plaintiff Ochoa, whose requests for reasonable accommodations and modifications were denied. The success of these outreach efforts confirms their necessity in response to D.R. Horton's discriminatory policy; if FHCST had not contacted residents of D.R. Horton's communities, FHCST would have been unaware of the individuals affected and unable to investigate and counteract the effects of D.R. Horton's discriminatory policy. In addition, FHCST's education efforts included sending educational mailings to sales agents who work at D.R. Horton's many sales offices located in FHCST's service area.

64.     In carrying out activities, for which it had not budgeted time or money, to counteract the harm caused by D.R. Horton, FHCST was forced to divert significant staff time and funds away from other planned activities. FHCST cancelled several planned activities in Nueces County, including researching potential discrimination in the rental of apartment buildings in the County, in-person education and outreach activities, and tester recruitment events. FHCST's inability to engage in its typical activities for achieving its mission in Nueces County impaired its efforts to achieve its goals of ensuring equal access to housing opportunities. FHCST is the only organization conducting these advocacy, education and outreach, counseling, and investigation activities in this part of its service area. Consequently, FHCST was not able to provide residents within its service area with counseling, referral, advocacy, and other services

that would have furthered FHCST's mission of ensuring that people in South Texas have equal housing opportunities.

65.     These activities were important to achieving FHCST's mission because the likely rental discrimination in Nueces County was preventing families in FHCST's service area from obtaining the housing of their choice in a manner free from discrimination. The education and outreach efforts in the County would have been a primary means for the organization to distribute fair housing-related information to the communities it serves in Nueces County. These efforts would have increased awareness and understanding of fair housing laws for both customers and housing providers and established the basis for future referrals from residents in the County. The cancellation of these activities therefore reduces the number of people FHCST is able to serve. Further, tester recruitment is necessary to FHCST's mission in order to ensure the organization has the human resources to determine whether discrimination is likely occurring and, where it is, to counsel the residents affected and to educate the discriminating housing providers about fair housing requirements. The cancellation of tester recruitment events frustrates FHCST's mission by impairing its ability to conduct future testing activities.

66.     The drain on staff time caused by having to investigate and counteract Defendants' discriminatory conduct also prevented FHCST from timely applying for new grants and funding sources. Outside grants and funding are the primary sources of income for the organization and applications for new grants and funding sources are necessary to FHCST's survival and ability to pursue its mission.

67.     Investigating and counteracting unlawful conduct by Defendants thus perceptibly impaired FHCST's mission by forcing the cancellation and curtailment of its planned efforts to promote fair housing and eliminate discriminatory housing practices activities.

68.     Unless enjoined, Defendants have stated that they will continue to engage in the unlawful conduct described herein and Plaintiff's injuries will increase because it will have to continue diverting resources and curtailing its other activities to counteract Defendant's conduct.

## CAUSES OF ACTION

### Count I

### Federal Fair Housing Act, 42 U.S.C. §§ 3604(c), 3604(f)(1), 3604(f)(2), and 3604(f)(3)

69.     Plaintiffs reallege and reincorporate by reference the allegations set forth above.

70.     Defendants' acts, policies, and practices, as described above, constitute intentional discrimination in the sale of a dwelling or otherwise make housing unavailable or deny a dwelling because of disability, in violation of 42 U.S.C. § 3604(f)(1).

71.     Defendants' express policy, established practice, and/or consistent set of acts of refusing to make accessibility-related changes to building plans has a disparate impact on people with disabilities, in violation of 42 U.S.C. § 3604(f)(1).

72.     Defendants' acts, policies, and practices, as described above, constitute intentional discrimination in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of disability, in violation of 42 U.S.C. § 3604(f)(2).

73.     Defendants' express policy, established practice, and/or consistent set of acts of refusing to make accessibility-related changes to building plans has a disparate impact on people with disabilities, in violation of 42 U.S.C. § 3604(f)(2).

74.     Defendants' acts, policies, and practices, as described above, constitute a refusal to permit requests for reasonable accommodations and reasonable modifications and a failure to engage in the required interactive process, in violation of 42 U.S.C. § 3604(f)(3).

75. Defendants' acts, including those through its agents, as described above, constitute the making, printing, publishing and/or have the effect of making, printing, or publishing a notice, statement, or advertisement that is about the sale or rental of a dwelling and that indicates preferences, limitations, and/or discrimination or the intention to make preferences, limitations, and/or discrimination because of disability in violation of 42 U.S.C. § 3604(c).

76. Defendants' acts, policies, and practices as described above, constitute a continuing violation of the Fair Housing Act from their initiation through the present.

77. As a result of the discrimination alleged in the previous paragraphs, Plaintiffs have sustained the injuries described herein.

## Count II

## Texas Fair Housing Act, Tex. Prop. Code Ann. §§ 301.022, 301.025(a), 301.025(b), and 301.025(c)

78. Plaintiffs reallege and incorporate by reference the allegations set forth above.

79. Defendants' acts, policies, and practices, as described above, constitute intentional discrimination in the sale of a dwelling, or make unavailable or deny a dwelling because of disability, in violation of Tex. Prop. Code Ann. § 301.025(a).

80. Defendants' express policy, established practice, and/or consistent set of acts of refusing to make accessibility-related changes to building plans has a disparate impact on people with disabilities, in violation of Tex. Prop. Code Ann. § 301.025(a).

81. Defendants' acts, policies, and practices, as described above, constitute intentional discrimination in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of disability, in violation of Tex. Prop. Code Ann. § 301.025(b).

82.     Defendants' express policy, established practice, and/or consistent set of acts of refusing to make accessibility-related changes to building plans has a disparate impact on people with disabilities, in violation of Tex. Prop. Code Ann. § 301.025(b).

83.     Defendants' acts, policies, and practices as described above, constitute a refusal to permit requests for reasonable accommodations and reasonable modifications and a failure to engage in the required interactive process, in violation of 42 U.S.C. § 301.025(c).

84.     Defendants' acts, including those through its agents, as described above, constitute the making, printing, publishing and/or have the effect of making, printing, or publishing a notice, statement, or advertisement that is about the sale or rental of a dwelling and that indicates preferences, limitations, and/or discrimination or the intention to make preferences, limitations, and/or discrimination because of disability in violation of Tex. Prop. Code Ann. § 301.022.

85.     Defendants' acts, policies, and practices as described above, constitute a continuing violation of the Fair Housing Act from their initiation through the present.

86.     As a result of the discrimination alleged in the previous paragraphs, Plaintiffs have sustained the injuries described herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant the following relief:

(1)     enter a declaratory judgment that the foregoing actions of Defendants violate the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601, *et seq.*, and the Texas Fair Housing Act, Tex. Prop. Code Ann. § 301.001, *et seq.*;

(2)      enter a permanent injunction directing Defendants and their agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

(3)      award compensatory damages to Plaintiffs Ochoa and Shaina and Mary Ricks in an amount to be determined by the jury that would fully compensate them for their economic losses, emotional distress, pain and suffering, physical injury and/or substantial risk of physical injury, deprivation of their housing and civil rights, and any other damages that have been caused by the conduct of Defendants alleged herein;

(4)      award compensatory damages to Plaintiff FHCST in an amount to be determined by the jury that would fully compensate it for its diversion of resources, frustration of mission, out-of-pocket costs, and any other damages that have been caused by the conduct of Defendants alleged herein;

(4)      award punitive damages to Plaintiffs in an amount to be determined by the jury that would punish Defendants for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(5)      award Plaintiffs their reasonable attorneys' fees and costs; and

(6)      order such other relief as this Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.


Date: November 9, 2023         /s/ Reed Colfax
                                  Reed Colfax (Bar No. 471430)
                                  Zoila Hinson*
                                  Nicholas Abbott*
                                  Emahunn Campbell*
                                  RELMAN COLFAX, PLLC

1225 19th St., NW
Suite 600
Washington, D.C. 20036
Tel: 202-728-1888
Fax: 202-728-0848
Email: rcolfax@relmanlaw.com
Email: zhinson@relmanlaw.com
Email: nabbott@relmanlaw.com
Email: ecampbell@relmanlaw.com

*Attorneys for Plaintiffs*

\**Pro hac vice* application to be filed